UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN GOMEZ,<br><br>         Petitioner,<br>v.<br><br>GARY SANDOR, Warden,<br><br>         Respondent. | Case No. 09cv02750 WQH (PCL)<br><br>**REPORT AND RECOMMENDATION RE: PETITION FOR WRIT OF HABEAS CORPUS** |

      Petitioner Ruben Gomez, a state prisoner, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging a conviction following a jury trial in San Diego Superior Court. (Doc. 1.) On March 25, 2010, Respondent filed an Answer to the Petition along with a Memorandum of Points and Authorities in support thereof, and lodged pertinent portions of the state court record ("Lodgments"). (Doc. 10.) Petitioner filed a Traverse on May 24, 2010. (Doc. 12.) This case is before the undersigned Magistrate Judge pursuant to S.D. Cal. Civ. R. 72.1(d) for report and recommendation for disposition. In consideration of the lodged record, and for the reasons set forth below, it is recommended the Petition be **DENIED**.

### I.    PROCEDURAL BACKGROUND

      Petitioner was prosecuted as an aider and abettor in the death of Daniel Menchaca. (Lodgment 8, at 1.) At a jury trial in San Diego County Superior Court Case No. SCE243463, Petitioner Ruben

1

Gomez was found guilty of (1) committing first-degree murder for the benefit of, at the direction of, and in association with, a criminal street gang with the specific intent to promote, further or assist in any criminal conduct by gang members, pursuant to California Penal Code sections 187(a) and 186.22(b)(5), and (2) carrying a loaded firearm in a vehicle while actively participating in a criminal street gang, pursuant to California Penal Code sections 12031 (a)(1) and (a)(2)(C). (Lodgment 1, Vol. 3, at 633-34.) On September 11, 2006, the trial court sentenced Petitioner to a total term of 25 years to life plus the midterm of two years to be served concurrently. (Lodgment 8, at 11.)

Petitioner appealed the judgment to the California Court of Appeal. (Lodgment 2.) Petitioner contended that his conviction should be reversed because (1) the trial court erred in instructing the jury regarding the natural and probable consequences doctrine; (2) the trial court erred in excluding a portion of the actual shooter's pre-trial statement; (3) the trial court erred in admitting testimony regarding Petitioner's prior bad acts; (4) the trial court erred in denying Petitioner's motion to suppress evidence from his vehicle ; and (5) cumulative error resulted in an unfair trial. (Id. at 24-84.)

On August 13, 2008, the Court of Appeal reversed the conviction for first degree murder based on an instructional error. (Lodgment 8, at 26.) The court ruled that if the People did not retry the first-degree murder count, the judgment would be modified to reflect a conviction for second degree murder. (Id. at 43.) As to the other counts, the Court of Appeal affirmed the trial court's judgment. (Id.)

Petitioner appealed to the Supreme Court of California, but his Petition for Review was denied on November 12, 2008. (Lodgment 11.)

After direct appeal, Petitioner's sentence was reduced to 15 years to life. (Doc. 1, at 1.)

Petitioner filed the instant Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 on December 8, 2009. (Doc. 1.) Petitioner argues that his constitutional rights to due process and to present a defense were violated when hearsay evidence of a statement from the actual shooter, Marco Moedano, indicating Moedano shot the victim "before the others could do anything," was improperly excluded. (Id. at 10.)

**II.     STATEMENT OF FACTS**

Federal habeas courts presume the correctness of the state court's factual determinations unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. §

2254(e)(1). The state court's factual determinations supporting Petitioner's conviction are not at issue and are extensively described in the California Court of Appeal's 2008 opinion. Thus, the following summary of Petitioner's conviction is taken verbatim from the Court of Appeal's decision:

> Gomez was charged in the death of Daniel Menchaca. Menchaca was shot 10 times just before midnight on March 6, 2004.
>
> 1. *The prosecution's case*
>
> Yolanda Castro was walking with Menchaca on the night he was shot. Castro testified that Menchaca had become a member of the Varrios Unidos street gang approximately three or four months before the shooting. His gang name was "Wino." At about 11:30 p.m. on March 6, Menchaca went to Castro's home looking for his younger brother, Juan. Juan was not at Castro's house, but Castro knew that Juan was visiting someone on Millar Street, and she offered to walk there with Menchaca.
>
> After Castro and Menchaca turned onto Millar Street, Castro saw someone on a bicycle talking to a man and a woman. Castro and Menchaca crossed the street. Just after they crossed, Castro heard someone say, "This is Dukes" or "This is Dukes' Street." When Castro heard "Dukes," she thought there was going to be a fight because Menchaca was a member of a rival gang. Castro turned and saw a man standing on the street side of one of two trucks that were parked across the street from where she and Menchaca were walking. Menchaca said, "That's cool." Six or seven guys then "popped up" from the far side of the trucks.
>
> Menchaca dropped a bottle of beer he had been holding and started to run away from the men. Castro thought the men were going to beat her and Menchaca. One of the men emerged from between a van and one of the two trucks and started shooting at Menchaca. Menchaca was hit and fell down. The shooter ran toward Menchaca and continued to shoot him repeatedly in the back until the gun was empty. The gun appeared to be a semi-automatic weapon.
>
> Castro heard someone say, "'Let's get out of here. We got to go.'" The shooter and the other men then got into the two trucks and drove off. Castro ran and hid behind a wall.
>
> Castro said that one of the trucks looked like a dark Toyota Tacoma and the other looked like a white Ford Ranger. The shooter had been wearing dark pants, a dark sweater, and a black baseball cap. Castro saw the faces of the man who said something about the "Dukes" and the shooter, but not the others. Castro believed the shooter was about 22 years old; the others who were with the shooter appeared to be teenagers. Castro did not hear anyone say anything other than the statement about the "Dukes" and the comment about leaving the scene.
>
> After the men drove off in the trucks, Castro went to check on Menchaca. A man and woman arrived at the scene shortly thereafter, and the woman called for an ambulance. At 11:50 p.m., the El Cajon Police Department received a report of shots fired on Millar Street. Officer Frank Lahaye responded to the scene, where paramedics pronounced Menchaca dead at 12:08 a.m. on March 7. Officers found 11 expended .22 caliber shells and a broken beer bottle near Menchaca's body, and an expended bullet under his body. Pathologists concluded after an autopsy that Menchaca died from gunshot wounds to the torso.
>
> El Cajon Police Detective Richard Wissemann was in charge of investigating Menchaca's murder. He collected evidence from the scene on Millar Street in the early morning hours of March 7, 2004, and he spoke with Castro. Castro described the two trucks she had seen.

A DMV records check revealed that Gomez, a documented Dukes gang member, owned a Toyota Tacoma truck. Wissemann went to Gomez's house in Santee that morning and saw a silver Toyota Tacoma parked in front of the house. Wissemann spoke with Gomez, and eventually searched the Tacoma. Wissemann found a loaded Rugar .45-caliber revolver wrapped in a ski mask under the rear seat of the truck's cab.

By July 2004, police had still not solved the Menchaca murder. Police were also attempting to solve another gang-related murder, the murder of Andres Lopez, that had occurred approximately a month after Menchaca's murder. Police had been told that a black Jetta might have been involved in the Lopez murder, and that the black Jetta might be connected to a Dukes gang member. Police learned that a Dukes member, William Marquez, was connected to a black Jetta. After seeing Marquez driving the Jetta away from his residence while his driver's license was suspended, officers detained him. Officers told Marquez that they believed he was involved in the Lopez murder. Marquez denied knowledge of the incident.

On July 29, 2004, Marquez called the detectives who had questioned him earlier that month and arranged a meeting. Marquez requested immunity for his role in Lopez's murder. A detective told Marquez that he could not promise immunity, but said that he would talk with the district attorney about it. Marquez eventually admitted that he had been driving the Jetta on the night another Dukes member shot and killed Lopez. Marquez explained that his group intended to go "gang banging" that night, so it was not a surprise to him that Lopez was shot.

Marquez was not present when Menchaca was killed, but said that he had seen Gomez, Marco Moedano, Jesus Carrasco, and Ben Norton at Daniel Alvarez's home immediately after the shooting. Marquez identified Moedano as the shooter, and said that Moedano had been wearing dark clothes and a black baseball cap that night.

Detectives met with Marquez two more times in August 2004, and Marquez ultimately signed a cooperation agreement with the San Diego County District Attorney. Pursuant to the terms of the agreement, in return for his truthful testimony, Marquez was promised immunity for the Lopez murder, dismissal of the traffic ticket he received for driving on a suspended license, placement in the witness protection program, moving expenses, money to pay for daily expenses and back child support he owed to Norton's sister, who was the mother of Marquez's child. After he signed the cooperation agreement, Marquez agreed to make telephone calls to other Dukes gang members and to allow Detective Wissemann to record the calls. Marquez also agreed to tape record face-to-face meetings with gang members.

On September 2, 2004, Marquez met with Gomez. The two went to Carrasco's home and then to Moedano's home. Marquez was wearing a concealed tape recorder to record the conversations. Marquez and Gomez discussed the fact that law enforcement officers were watching them, and that Moedano had killed three people with one gun. Gomez identified Moedano's victims as "[t]hat black fool, the fuckin' fool from Juniors, and the fool from VU." The "fool from VU" referred to Menchaca. Marquez asked Gomez who it was who had said, "Dukes" on the night Menchaca was killed. Gomez discussed the fact that a witness had identified the trucks, and had told officers that she heard someone say "Dukes," and said that "that was enough to [cause officers to] go to my pad."

That day, Marquez tried to set up a meeting with Gomez, Carrasco, and Norton for the following day. At Moedano's house, Gomez asked Moedano if he had thrown the gun he used in the Lopez murder into the water. Gomez later asked Moedano how many people he had killed with that gun. Moedano counted three, not including Menchaca; Moedano had used a .22-caliber gun to kill Menchaca. After he described having shot rival gang members at a school, Moedano and Gomez started talking about Menchaca's murder. Gomez said,

4

"[W]e were lookin' to blast some Locos and Orphans so we-It was me and Rascal and it was him and Boxer. And this fool says, 'man, let's call it a night and let's meet up in the street....' [¶] ... And we were looking for ... we were looking for that fool from V.U. Like man, and we're like-and the next thing you know, hey, isn't that the fool from V.U.? An' he walking by us...." The conversation proceeded as follows:

"[Moedano]: Yeah, it was fucked up, dog. But-but it was like unexpected, homey. Like ...

"[Gomez]: Yeah, we were not expecting that shit.

"[Moedano]: That was a ... I don't know, dog.. [BELCHING SOUND] ... I saw that fool, dog, and I fucking ... I just wanted to ...

"[Marquez]: But you blazed that fool, though, huh?

"[Moedano]: Yeah, ahhh ... all of 'em hit. I think like ten shots hit 'em, dog.

"[Marquez]: Shit. Ten shots hit that fool?

"[Moedano]: Probably eleven, dog.

"[Marquez]: That fool isn't gonna be livin'.

"[Moedano]: I fuckin' chased that fool down, homey. Buckin' him, homey ...

"[Marquez]: Oh, you chased 'em?

"[Moedano]: Yeah. He started....

"[Marquez]: So he ran?

"[Moedano]: ... he started running ... no, no, when I started go towards 'em, I bust 'em first, pow, pow, pow, he's like 'oh' and he started running, fool, and I chased 'em down, kept buckin' him homey, till he dropped. When he dropped right there, an' I started buckin'-I still was buckin' him, homey."
(Punctuation, grammatical errors and brackets in original.)

Officers arrested Gomez, Carrasco, Norton and Moedano on September 14, 2004.

At trial, Marquez testified that he became a member of the El Cajon Dukes at age 16, after having joined the Tiny Dukes at age 13. Marquez had known Gomez and Carrasco from the time he was approximately 15 or 16 years old. Marquez testified that Gomez is a member of the Dukes, and that rivals of the Dukes include the Varrios Unidos, Orphans, and Locos gangs.

Marquez admitted that he had stabbed people, shot at people, and robbed people as part of his gang activity. Marquez explained some gang terminology, testifying that "gang banging means when you put in work for the hood, to be out jumping people, shooting people, stabbing people." Marquez explained that " 'Calling out your hood' " is when an individual yells out his or her gang's name. He added that when this is done in the presence of a rival gang member, it is meant as a challenge.

A gang expert testified that the El Cajon Dukes had been established in El Cajon since the late 1980's or early 1990's. He explained the criteria by which he determined that the Dukes were a criminal street gang, and stated that as of March 6, 2004, Gomez, Moedano, and Norton were documented members of the El Cajon Dukes. Carrasco was not a documented

5

member of the gang at the time Menchaca was killed, but became a documented member prior to trial, based on his admissions that were recorded on the undercover tapes. The gang expert testified that the El Cajon Dukes considered other gangs, like Varrios Unidos, the El Cajon Locos, and the El Cajon Orphans, to be rivals, and that there had been a history of violence between the Dukes and rival gangs before March 6, 2004. Dukes members had been convicted of numerous crimes, including felony assault with a deadly weapon, voluntary manslaughter, murder, attempted murder, and conspiracy to commit assault.

2. *The defense case*

Menchaca's brother, Juan, testified that Gomez used to live on Millar Street and that Gomez had attended El Cajon Valley Junior High School with Menchaca. Juan testified that Gomez and Menchaca would hang out together and that they were not enemies. Juan said that Menchaca also knew Carrasco, and that they had no animosity toward each other. Juan denied knowing that Gomez and Carrasco were members of the El Cajon Dukes.

Gomez's uncle testified that he was at a party at Gomez's home in Santee at around 7:00 p.m. on March 6, 2004. Gomez was at the party when his uncle left at around 11:00 p.m. The uncle testified that Gomez worked for him in his landscaping business and that Gomez was attending Grossmont College. Defense counsel introduced paperwork showing that Gomez was enrolled in classes at Grossmont College during the fall of 2003 and the spring of 2004.

Nicole Paraiso testified that she dated Marquez for three months. Paraiso testified that Marquez had threatened her, and that after they broke up, he used her cellular phone and found the phone numbers of other men. Marquez told Paraiso that he thought she had been cheating on him, and threw the phone against a window, breaking the blinds and the phone. Marquez slapped her, lifted her off the ground by her neck, and choked her. He said that if Paraiso did not tell him the names of the men, he would knock her teeth out. Paraiso testified that Marquez repeatedly choked her for 30 seconds at a time for the next four hours. He also hit her on the arms, chest, stomach, and face. Paraiso told Marquez that she was going to call the police. He told her that if she did, he would have someone kill her.

People v. Gomez, Court of Appeal, Fourth Appellate District, D049431 (August 13, 2008). (Lodgment 8, at 2-10.)

### III.   DISCUSSION

#### A.   Legal Standards For Federal Habeas Relief

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  Only errors of federal law can support federal intervention in state court proceedings.  Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989) (federal courts are not concerned with errors of state law unless they rise to the level of a constitutional violation).  Federal habeas courts are bound by the state's interpretation of its own law.  Estelle v. McGuire, 502 U.S. 62, 68 (1991) (federal courts may not reexamine state court

6

determinations on state-law questions); Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990) (federal courts "have no authority to review a state's application of its own laws").

Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997). AEDPA establishes a "highly deferential standard for evaluating state-court rulings," requiring "that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (citation omitted). The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A federal court can grant a prisoner habeas relief only if it determines the result of a claim adjudicated on the merits by a state court "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Bell v. Cone, 535 U.S. 685, 694 (2002). A state court's decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court authority, or (2) it "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but reaches a different result. Early v. Packer, 537 U.S. 3, 8 (2002). To be found "unreasonable," the application of the precedent "must have been more than incorrect or erroneous;" it "must have been 'objectively unreasonable.'" Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citation omitted); Williams v. Taylor, 529 U.S. 362, 409-10 (2000) (distinguishing an objectively unreasonable application from an incorrect application); see also Middleton v. McNeil, 541 U.S. 433, 436 (2004) (*per curiam*).

The denial of a habeas petition by the California Supreme Court without comment or citation constitutes a decision "on the merits of the federal claims" presented. Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992). Where there is no reasoned decision from the state's highest court, the reviewing federal court "looks through" to the rationale of the underlying decision. Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground"); Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) ("we review the 'last reasoned decision' by a state court").

7

**B.    Recommended Findings: The Ground For Relief Lacks Merit**

    **1.    Petitioner's Argument**

Petitioner argues that the trial court violated his Sixth and Fourteenth Amendment rights because a statement made to police informant Marquez by the actual shooter, Moedano, who indicated he acted alone in the murder of Menchaca, should have been admitted as evidence under the state's hearsay exception for statements against penal interest. (Doc. 1, at 6). In other words, Petitioner alleges that the state court, by rejecting the presentation of this evidence, violated Petitioner's federal constitutional rights to due process and to present a defense. (Id.)

    **2.    Procedural Background**

During the trial, Petitioner's counsel attempted to proffer hearsay evidence of a statement made by Moedano to Marquez, a fellow gang member and police informant, that Moedano shot victim Menchaca "before anybody could do anything." (Lodgment 12, at 3031.) Counsel asserted that the evidence was admissible as a declaration against penal interest, pursuant to California Evidence Code section 1230.[1] (Id. at 3032.) Ultimately, the court concluded that the reliability element of the section 1230 declaration was not met because the declaration was not completely against the penal interest of the principal perpetrator, Moedano. (Id. at 3034-35.)

The California Court of Appeal discussed California's requirements for finding that a hearsay statement satisfies the declaration against penal interest exception, noting that a statement is not reliable simply because the declarant admitted criminal culpability. (Lodgment 8, at 28.) Instead, the statement must be specifically disserving to the declarant's penal interest.[2] (Id.) The California Court of Appeal concluded that the trial court correctly found Marquez's testimony regarding Moedano's statement not sufficiently reliable pursuant to California Evidence Code section 1230. (Id. at 24-36.) As the state appellate court reasoned:

---

[1] California Evidence Code section 1230 contains a hearsay exception for declarations against penal interest. The hearsay exception is inapplicable unless the declarant is unavailable as a witness and the statement was so contrary to the declarant's interest as to render him at risk for criminal liability. CAL. EVID. CODE § 1230 (2010). Furthermore, under California law, it is improper to find a statement reliable simply because it includes an admission of criminal culpability. See People v. Duarte, 24 Cal. 4th 603, 611 (2000).

[2] See People v. Lawley, 27 Cal. 4th 102, 153 (2002) ("A court may not, applying this hearsay exception, find a declarant's statement sufficiently reliable for admission 'solely because it incorporates an admission of criminal culpability.'") (citations omitted).

8

> [R]egardless of whether Moedano, in shooting Menchaca, acted before the individuals who were with him were aware of what he was doing, Moedano was clearly not simply an accomplice to the offense, and his participation cannot be considered minor. Thus, even if Moedano shot Menchaca after his friends encouraged him to do so, he still could not claim that he was simply an accomplice to the offense or that this participation was relatively minor. Rather, Moedano was the principal perpetrator of the offense under either scenario. Whether Moedano's friends could have done anything before he shot the victim does not change the fact that Moedano was the principal offender, and thus, that this participation was the most serious relative to that of any of the others who were present….As a result, the trial court was well within its discretion in concluding that the portion of Moedano's statement to the effect that he shot Menchaca 'before anybody could do anything' was not specifically disserving to Moedano, and that it was not admissible as a statement against penal interest."

(Id. at 29-30.)

### 3. Clearly Established Federal Law

A criminal defendant's constitutionally guaranteed right to present relevant evidence in his own defense at trial is not absolute, but limited by the reasonable application of evidentiary rules. Taylor v. Illinois, 484 U.S. 400, 408, 410 (1988); see also U.S. Const. amend VI. The Constitution gives state courts "broad latitude" to establish evidentiary rules for criminal trials that serve a legitimate interest and are neither arbitrary nor disproportionate in promoting these ends. United States v. Sheffer, 523 U.S. 303, 308 (1998). Indeed, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. South Carolina, 547 U.S. 319, 326 (2006); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) ("[A]ny number of familiar and unquestionably constitutional evidentiary rules authorize the exclusion of relevant evidence.") Therefore, a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

To constitute a basis for habeas relief, a trial court's exclusion of evidence pursuant to a state rule must be so fundamentally unfair as to violate the defendant's right to due process. See Scheffer, 523 U.S. at 315 (discussing the exclusion of polygraph evidence). Therefore, the erroneous exclusion of evidence on hearsay grounds may constitute a denial of constitutional due process if the hearsay statement is material to the trial and the statement includes "persuasive assurances of trustworthiness." Chambers, 410 U.S. at 302. In this way, declarations against one's penal interest tend to assure the

trustworthiness of out-of-court, material statements because the Court assumes "a person is unlikely to fabricate a statement against his own interest." Id. at 299.

An example of a material statement that bears persuasive assurances of trustworthiness is illustrated in Chambers. See id. at 294-302. Chambers was tried for the murder of a police officer during a riot, a murder to which another person repeatedly and in the presence of several witnesses confessed. Id. at 285, 300-01. Indeed, shortly after the riot, the other person, McDonald, gave a sworn statement to defendant's attorney, confessing to the police officer's murder. Id. at 285. However, McDonald later retracted his statement. Id. Although the defense attempted to develop a theory at trial that McDonald shot the officer, the state court excluded the testimony of McDonald's three close friends, to whom he had confessed the murder of the officer repeatedly, because of a state hearsay and "voucher" rule. Id. at 291-93. Ultimately, the Supreme Court found that the testimony bore the appropriate indicia of reliability because McDonald's alleged original statements were made spontaneously, repeatedly, and were unquestionably against McDonald's penal interest. Id. at 301. Thus, the excluded testimony "was well within the basic rationale of the exception for declaration against interest." Id. at 302.

### 4. Petitioner's Argument Fails

In the instant case, the State's legitimate interest to exclude unreliable hearsay evidence did not unfairly interfere with the Petitioner's rights to present a defense and to due process. Petitioner's desire to present hearsay evidence of a statement made to police informant Marquez that Moedano shot victim Menchaca "before anybody could do anything" was appropriately weighed against the state's legitimate interest to present only reliable evidence to the jury. The Court of Appeal reasonably and persuasively concluded that the this hearsay evidence, unlike the evidence in Chambers, was not "specifically disserving" to declarant Moedano's penal interest. (Lodgment 8, at 29.) First, the declarant in the instant case, Moedano, did not further incriminate himself. (Id., at 29-30.) Instead, the statement was consistent with the other presented evidence: Moderno was, in fact, the sole shooter and principal perpetrator of the murder. (Id.) Secondly, unlike Chambers, where the oral confession of the declarant completely exculpated the defendant, Moedano's statement here did not necessarily relieve Gomez of his criminal liability as an aider and abettor or co-conspirator. (Id.) By saying that he acted before the others could, Moedano did not necessarily say he was the only participant in the murder or that Gomez

10

had nothing to do with the crime. Thus, after considering the fundamental requirement of trustworthiness as applied in Chambers, both the trial court and the California Court of Appeal reasonably concluded that no such assurance of reliability existed with respect to Marquez's testimony about Moedano's statement. (Id. at 30-34.)

In light of these circumstances, this Court cannot find that the exclusion of Marquez's testimony about Moedano's statement contravened the controlling Supreme Court precedents on the right to present a defense and the right to due process. The state courts' conclusion to exclude the evidence as unreliable hearsay was neither contrary to nor an unreasonable application of Chambers or any other clearly established federal law. Accordingly, the state court decision must be given deference, and the claim should be **DENIED**.

### IV. CONCLUSION AND RECOMMENDATION

For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

**IT IS SO ORDERED** that no later than **August 31, 2010**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendations."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **September 10, 2010**. The parties are advised that failure to file objections within specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:   August 13, 2010

Peter C. Lewis
U.S. Magistrate Judge
United States District Court

11